First Division
May 29, 2007

No. 1-05-3998

| | | |
|---|---|---|
| EXPRESS VALET, INC., and | ) | Appeal from |
| FRANK ESPOSITO, | ) | the Circuit Court |
| | ) | of Cook County |
| Petitioners-Appellants, | ) | |
| | ) | |
| v. | ) | 05 MI 450322 |
| | ) | 03 MI 450989 |
| THE CITY OF CHICAGO, a Municipal | ) | |
| Corporation, | ) | |
| | ) | Honorable |
| Respondent-Appellee. | ) | Edna M. Turkington, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE McBRIDE delivered the opinion of the court:

Petitioners, Express Valet, Inc., and Frank Esposito, appeal from orders of the circuit court of Cook County affirming the decisions of the Department of Administrative Hearings (DOAH). The DOAH initially found petitioners liable for violating multiple sections of the Municipal Code of Chicago (the Code) arising out the operation of a valet parking service in the City of Chicago, and imposed various fines based upon those violations. On administrative review, the circuit court affirmed the DOAH's findings as to liability, but remanded the matter to the DOAH for a new hearing on fines. Following that hearing, the DOAH imposed new fines on petitioners for their violations of the Code, and the DOAH's decision was affirmed by the circuit court on administrative review.

Petitioners appeal, contending that (1) the record filed by the City of Chicago (the City) as its answer to the initial complaint for administrative review failed to comply with section 3-108 of the Administrative Review Law (735 ILCS 5/3-108(b) (West 2002)); (2) that the DOAH erred by finding that the fines imposed were the individual responsibility of Esposito rather than the

1-05-3998

corporate responsibility of Express Valet; and that (3) the fines imposed by the DOAH are excessive and unconstitutional.

In August 2003, respondent, the City, issued a series of "Administrative Notice[s]" charging Esposito and Express Valet with multiple violations of the Code. The City filed 11 administrative cases against Esposito and Express Valet arising from these violations. In eight of those cases, each of which involved a location in the City of Chicago where petitioners operated a valet parking service, Express Valet and Esposito were charged with violating sections 4-232-060 and 4-232-070 of the Code. Chicago Municipal Code §§ 4-232-060, 4-232-070 (amended December 9, 1992, and October 28, 1997, respectively). Specifically, petitioners were charged with operating a valet parking service without liability insurance coverage and, therefore, without a valid "valet parking operator license," from February 10, 2003, to June 30, 2003. Section 4-232-060(a) of the Code provides:

"[N]o person shall conduct a valet parking service unless he has a valid valet parking operator license issued in accordance with this chapter. A separate license is required for each loading area served." Chicago Municipal Code §4-232-060(a) (amended December 9, 1992).

Section 4-232-070(b) of the Code provides:

"No valet parking operator license, or renewal thereof, shall be issued unless the applicant provides proof to the commissioner that he has obtained liability insurance covering all locations at

2

which he operates or seeks to operate ***.  *Upon termination or lapse of the licensee's insurance coverage, any license issued to him shall automatically expire*."  (Emphasis added.)  Chicago Municipal Code §4-232-070(b) (amended October 28, 1997).

In each of those eight cases, petitioners were also charged with violating section 2-24-050 of the Code by providing false insurance certificates to the Department in order to obtain a valet parking license and thereby obstructing the Commissioner of Consumer Services (Commissioner) in the performance of his duties.  Section 2-24-050 of the Code provides:  "No person shall *** obstruct the commissioner of consumer services *** in the performance of his duties."  Chicago Municipal Code §2-24-050 (1990).

In the ninth case, corresponding to another location where petitioners operated a valet parking service, Express Valet and Esposito were again charged with violating sections 4-232-060, 4-232-070, and 2-24-050 of the Code.  Additionally, petitioners were charged with two violations of section 2-24-060(a) of the Code, which provides in relevant part that "[n]o person shall engage in any act of consumer fraud, unfair method of competition or deceptive practice while conducting any trade or business in the city."  Chicago Municipal Code §2-24-060(a) (amended November 12, 1997).  Specifically, the administrative notices alleged that petitioners took possession of Adam Mednis' vehicle and gave him a receipt which falsely indicated that Express Valet had the liability insurance coverage required by the Code.  The notices further alleged that Express Valet took possession of Mednis' vehicle while "holding itself out to be a valet parking service conducting business in accordance with municipal ordinances and returned

3

1-05-3998

[the] vehicle to [an] unauthorized third party." In the same case, petitioners were charged with violating section 4-276-470(a)(1) of the Code by misrepresenting to customers that Express Valet was a properly licensed and insured valet parking service from July 1, 2002, to June 30, 2003. Section 4-276-470(a)(1) of the Code states:

> "It shall be unlawful for any person to act, use or employ any deception, fraud, false pretense, false promise or misrepresentation, or to conceal, suppress or omit any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale *** or advertisement of any merchandise." Chicago Municipal Code §4-276-470(a)(1) (amended December 9, 1992).

Petitioners were also charged with violating section 4-232-070(d) of the Code by failing to stamp a receipt with the date and time the vehicle was returned to the patron, and by failing to return the receipt to the patron. Section 4-232-080(d) of the Code provides in relevant part:

> "When a valet parking attendant returns custody of the vehicle to the owner, the attendant must time stamp the receipt with the time and date the valet parking operator surrendered custody of the vehicle, and return it to the patron." Chicago Municipal Code §4-232-080(d) (amended October 28, 1997).

Petitioners were further charged with violating section 2-24-050 of the Code by failing to attend an informal hearing scheduled for August 6, 2003, and provide the documentation requested by

4

the Department of Consumer Services (the Department). Finally, petitioners were charged with violating section 2-24-060(a) by giving receipts to customers from February 10, 2003, to June 30, 2003, that falsely indicated that Express Valet had the required liability insurance.

In the tenth case, Express Valet was charged with violations of sections 4-232-060(a) and 4-232-070(b) of the Code. In addition, Express Valet was charged with violating section 4-232-080(d) of the Code by issuing receipts that failed to disclose the company's correct business address. Section 4-232-080(d) of the Code provides in relevant part that:

> "All valet parking attendants must, upon taking custody of a patron's vehicle, issue a numbered receipt to each customer containing the name, address and telephone number of the company providing the valet service ***." Chicago Municipal Code §4-232-080(d) (amended October 28, 1997).

In the final case, Express Valet was charged with violating section 4-232-080(b) of the Code by illegally parking Eric Fiche's Honda Civic on May 9, 2002. Section 4-232-080(b) of the Code states:

> "No valet parking service operator shall park or suffer its agents to park patrons' vehicles upon the public way except under lawful conditions ***. *** [T]he fine for any parking or compliance violations incurred by a vehicle while in the custody of a valet parking operator shall be the sole responsibility of the valet parking operator ***." Chicago Municipal Code §4-232-080(b)

1-05-3998

(amended October 28, 1997).

Express Valet was also charged with violating section 2-24-060(a) of the Code by failing to inform Fiche that his car was illegally parked and had received a ticket while in custody of Express Valet. Pursuant to section 2-24-060(e)(2) of the Code, which authorizes the Commissioner to order restitution be paid to "persons aggrieved" by violations of 2-24-060(a), Express Valet was ordered to pay $200 to Fiche for the parking ticket. See Chicago Municipal Code §2-24-060(e)(2) (amended November 12, 1997).

The DOAH heard all of these cases at a consolidated administrative hearing on November 21, 2003. At that hearing, the City presented the testimony of six witnesses.

Eric Fiche testified that on May 9, 2002, Express Valet parked his Honda Civic at a restaurant and that approximately two months later he received a notice from the City that he had received a $200 ticket for a parking violation that had occurred on May 9, 2002. In July 2002, Fiche contacted Esposito, who acknowledged that he knew of the ticket and promised Fiche that he would reimburse him for the fine. According to Fiche, he was never reimbursed for the ticket.

Bettina Johnson testified that she is employed by the City's Department of Consumer Services and is responsible for the licensing of valet parking companies. The license period for a valet parking license is generally from July 1 of the current year to June 30 of the following year. Johnson testified that in order to obtain a valet parking license, an applicant must fill out an application, pay a fee, and provide a number of supporting documents, including a certificate of insurance with effective and expiration dates. Johnson testified that if a valet parking company's insurance is cancelled, the insurance company notifies the Department, which then advises both

6

the company and the Department's investigators.

Johnson testified that Esposito was the person she "dealt with from Express Valet" regarding valet parking service licenses and that no other person represented Express Valet in its dealings with the Department. In June or July of 2002, Esposito visited the Department's licensing facility to renew Express Valet's valet parking service licenses and submitted proof of insurance for various locations where he operated a valet parking service. Johnson identified the insurance certificates that Esposito submitted to show that Express Valet was insured at 10 different locations from June 30, 2002, to June 30, 2003. Each document, titled "Certificate of Liability Insurance," was purportedly prepared by Byrne, Byrne & Co., and signed by Geoff Olsen.

On cross-examination, Johnson testified that sometime after July, 2003, she received notice that Express Valet's insurance had been cancelled. When Johnson subsequently contacted Esposito by telephone to inform him of this, Esposito responded that he had no knowledge of any such cancellation.

Geoffrey Olsen, an insurance agent for Byrne, Bryne & Co., testified that he sold insurance to Esposito beginning in 1999 or 2000. Olsen reviewed each of the certificates of insurance that Johnson identified as having been submitted by Esposito and testified that none of them had been prepared by himself or anyone else from his company. Among the irregularities in the certificates that led him to this conclusion, Olsen noted that his name was misspelled; that portions of the certificates were "filled in" while others appeared to have been generated by a computer; that there were discrepancies between the dates on which the certificates had allegedly

been prepared and the dates on which they had allegedly been filed by his office; and that two of the certificates listed locations that Olsen did not remember "being scheduled." Olsen further testified that the effective dates of the last insurance policy he sold to Esposito were November 21, 2002, to November 21, 2003, and that he sold this policy to Esposito over the telephone in early November. After that policy was issued, Olsen made "numerous phone calls" to Esposito in an attempt to obtain the premium for the policy. Olsen spoke to Esposito in mid-to-late December 2002, and told Esposito that he needed to send the down payment and the finance agreement immediately if the policy was to continue. Olsen never received either the finance agreement or the payment from Esposito. On February 11, 2003, Olsen sent Esposito a letter informing him that the insurance policy for Express Valet was cancelled as of February 10, 2003, "for non-payment of premium."

Albert Lagunas, an investigator for the Department, testified that on July 17, 2003, he was assigned to check the valet stand at an establishment known as the "Leg Room." There was a sign in front of that building advertising that parking was provided by Express Valet. Lagunas issued citations to Express Valet for operating without a valet license, for issuing tickets to customers that had an incorrect business address for Express Valet, and for not having insurance.

Adam Mednis testified that on June 13, 2002, he went to the "Leg Room" and left his car with Express Valet. In exchange for his car, Mednis was given a ticket stating that Express Valet had liability insurance as required by the Code. Upon exiting the club, Mednis was told by the valet parking attendant that his car had been given to someone else by mistake.

Tina Mednis (Tina), Adam Mednis' mother, testified that she contacted Esposito after her

8

son's car was stolen. She obtained Esposito's telephone number from the valet ticket given to her son in front of the "Leg Room." Tina testified that Esposito refused to provide her with Express Valet's insurance information and that she eventually obtained this information from the manager of the company that operates the "Leg Room." Tina also spoke with Olsen, who told her that Express Valet's insurance policy had been cancelled. Tina further testified that her son's vehicle was recovered by the police approximately three weeks after it was stolen. The vehicle was "smashed," and everything was stolen out of it. Shortly thereafter, Tina filed a complaint with the Department against Express Valet. She received a notice from the Department to attend an informal fact-finding hearing regarding the incident on July 23, 2003. A notice was also sent to Express Valet, 1925 North Lincoln Avenue, Chicago, Illinois, noting the date, time and place of the hearing and stating that failure to attend the hearing would constitute a separate violation. Tina testified that no one from Express Valet attended the hearing.

Esposito and Express Valet presented the testimony of Adriane Williams, a manager at Express Valet. Williams testified that he was working at the "Leg Room" on the night of June 13, 2003, and that two people paid for the valet parking and drove off in Mednis' vehicle. Williams further testified that he did not comply with the Code requirement that a customer's receipt must be time-stamped and that he was not aware of this requirement until after the Mednis incident.

Following arguments, the DOAH found Esposito and Express Valet liable on all charges in each of the 11 cases. Specifically, the DOAH found that Esposito knew or should have known that his business was uninsured; that the certificates of insurance were altered to deceive the Commissioner and to obtain a license, which was deceptive to the public; that Esposito falsely

represented to the public that Express Valet was insured; that Esposito's misrepresentations obstructed the Commissioner's duty to issue valet parking licenses; that Express Valet was at fault for the $200 parking ticket issued to Fiche; that Express Valet failed to time-stamp Mednis' valet parking ticket; that Esposito failed to appear at the hearing regarding the Mednis incident; that the Mednis family was entitled to reimbursement for the damage to their vehicle; and that Esposito failed to have insurance, and, thus, a valid valet parking license, from February 10, 2003, to June 30, 2003. The DOAH entered separate orders finding petitioners liable in each of the 11 cases and imposing $116,050 in fines, costs, and restitution against Esposito and Express Valet.

Petitioners filed a petition for administrative review in the circuit court of Cook County on December 24, 2003. The City answered and moved for a specification of errors. Petitioners' specification of errors asserted that the administrative record "was so incomplete that it [could not] be reviewed," that the DOAH erred by failing to specify whether liability for the ordinance violations rested with Express Valet or Esposito, and that the fines imposed were excessive and unconstitutional. The City agreed that some of the fines imposed were not consistent with the Code and that the matter should therefore be remanded "for the sole purpose of imposing fines." On October 22, 2004, the circuit court entered an order stating that the record was "adequate for [the court's] review." On December 10, 2004, the court entered an order affirming DOAH's findings as to liability, but remanding the matter "for the purpose of a new hearing on fines." The court instructed the hearing officer to "address who [the] fines were imposed against."

On remand, the parties submitted briefs on the issue of fines. The City requested that, for each ordinance violation, the DOAH impose the maximum fine permitted under the Code. The

1-05-3998

City also argued that Esposito should be personally liable for the fines imposed because he personally and actively participated in deceptive and fraudulent acts. Petitioners responded that the maximum fines being sought by the City were excessive and unconstitutional, and that the DOAH had no authority to grant the City's request to "pierce the corporate veil" and hold Esposito personally liable for the fines imposed. The DOAH held a hearing on the matter on March 17, 2005, at which no testimony or evidence was presented. At the conclusion of that hearing, the DOAH found that nine of the citations were issued to Esposito personally and to the corporation, Express Valet, Inc., and that, based on Esposito's personal participation in the fraud perpetuated against the Department, the fines in those nine cases were the joint and several responsibility of Esposito and Express Valet.

In 8 of the 11 cases, the DOAH imposed $14,625 in fines and costs. In each of those cases, the DOAH fined petitioners $14,100, or $100 per offense, for violating section 4-232-060 of the Code by operating without a license for 141 days (February 10, 2003, to June 30, 2003). The DOAH also fined petitioners $500 in each of the eight cases for violating section 2-24-050 of the Code by submitting fraudulent insurance certificates and therefore interfering with the Department, and suspended Express Valet's license to do business at each location for violating section 4-232-070(b) of the Code by operating without insurance.

In the ninth case, the DOAH ordered Esposito and Express Valet to pay $1,000 in restitution to Tina Mednis and assessed $16,525 in fines and costs. Specifically, the DOAH fined petitioners $14,100 for operating without a license at the "Leg Room," $500 for interfering with the Department, $500 for violating section 2-24-050 of the Code by failing to attend the hearing

11

before the Department concerning the Mednis complaint, $300 for each of three violations of section 2-24-060(a) of the Code, which were based on petitioners having engaged in acts of consumer fraud or deceptive practice, $300 for violating section 4-276-470 of the Code by misrepresenting to customers that Express Valet had a licensed valet parking service, and $200 for violating section 4-232-080(d) of the Code by issuing a receipt that was not stamped with the date and time the vehicle was returned to the patron. The DOAH also suspended Express Valet's business license.

In the tenth case, the DOAH assessed $475 in fines and costs. The DOAH fined Express Valet $250 for operating without a valid license and $200 for issuing receipts that failed to disclose the company's correct business address and suspended its business license. In the eleventh case, the DOAH assessed $625 in fines and costs. Express Valet was fined $300 for parking Fiche's vehicle in an unlawful manner and $300 for failing to inform Fiche that his vehicle was illegally parked and had received a ticket and was ordered to pay $200 in restitution.

Petitioners filed a petition for administrative review on May 5, 2005. The City answered and moved for a specification of errors. Petitioners' specification of errors asserted that the administrative record was "so inadequate" that it could not be reviewed, that the DOAH erred by piercing the corporate veil and holding Esposito and Express Valet jointly and severally liable for the fines imposed, and that the fines imposed were excessive and unconstitutional. Following a hearing, the circuit court affirmed the fines imposed by the DOAH. This appeal followed.

Prior to addressing the merits of petitioners' appeal, we consider the appropriate standard of review. In reviewing a final administrative decision under the Administrative Review Law (735

1-05-3998

ILCS 5/3-101 *et seq.* (West 2002)), this court's role is to review the administrative decision rather than the circuit court's decision. Du Page County Airport Authority v. Department of Revenue, 358 Ill. App. 3d 476, 481 (2005). The appropriate standard of review concerning administrative decisions is contingent upon whether the question being reviewed is one of fact, one of law, or a mixed question of fact and law. City of Belvidere v. Illinois State Labor Relations Board, 181 Ill. 2d 191, 205, 692 N.E.2d 295 (1998). In the event that the question is one of fact, our supreme court has stated:

> "[O]n administrative review, it is not a court's function to reweigh
>
> the evidence or make an independent determination of the facts. Rather,
>
> the court's function is to ascertain whether the findings and decision of the
>
> agency are against the manifest weight of the evidence. [Citations.] An
>
> administrative agency decision is against the manifest weight of the
>
> evidence only if the opposite conclusion is clearly evident." Abrahamson v.
>
> Illinois Department of Professional Regulation, 153 Ill. 2d 76, 88, 606
>
> N.E.2d 1111 (1992).

If the question is one of law, however, this court's standard of review is *de novo*. Branson v. Department of Revenue, 168 Ill. 2d 247, 254, 689 N.E.2d 961 (1995). Under the *de novo* standard, little or no deference is afforded the decision-maker's ruling. Branson, 168 Ill. 2d at 254.

For mixed questions of fact and law, or where a case involves an examination of the legal effect of a given set of facts, the court must apply a "clearly erroneous" standard of review. City

13

of Belvidere, 181 Ill. 2d at 205.

" 'Clearly erroneous' is said to rest somewhere between the 'manifest weight of the evidence' and de novo, requiring us to afford some deference to the agency's experience and expertise. [Citations.] Under this standard, we must accept the administrative agency's findings unless we are firmly convinced the agency has made a mistake." Randolph Street Gallery v. Zehnder, 315 Ill. App. 3d 1060, 1064, 735 N.E.2d 100 (2000).

Petitioners first contend that the record filed by the City as its answer to the original petition for administrative review failed to comply with section 3-108(b) of the Administrative Review Law (735 ILCS 5/3-108(b) (West 2002)) and was "so inadequate" that it prevented a meaningful review of the evidence presented at the administrative hearing. Petitioners specifically complain that the transcript of the administrative hearing contains numerous "inaudible" portions, and request that we remand this matter to the Department of Administrative Hearings "to determine if a complete record can be obtained."

Section 3-108(b) of the Administrative Review Law provides that "the administrative agency shall file an answer [to the complaint] which shall consist of the *** entire record of proceedings under review, including such evidence as may have been heard by it and the findings and decisions made by it." 735 ILCS 5/3-108(b) (West 2002). In this case, petitioners were charged in 11 cases with violating multiple sections of the Code. The DOAH held an administrative hearing on those violations and found petitioners liable on all counts. Petitioners thereafter filed a complaint for administrative review in the circuit court of Cook County. The

1-05-3998

City filed an answer which it asserted consisted of a "complete" copy of the record of proceedings under review, and moved for a specification of errors. Petitioners' specification of errors argued, among other things, that the administrative record was "so incomplete that it [could not] be reviewed," and that the circuit court could not "perform its role with a transcript such as this." On October 22, 2004, the circuit court entered an order stating that the record was "adequate for [the court's] review." The court subsequently entered another order affirming the DOAH's findings as to liability but remanding the matter for "a new hearing on fines." On remand, the DOAH imposed fines against petitioners following briefing by both parties and a hearing at which no evidence was presented. Those fines were upheld by the circuit court on administrative review.

We find that the record submitted by the City in response to petitioners' initial complaint for administrative review fully complied with section 3-108(b) of the Administrative Review Law. Our review shows that the record filed in the circuit court contained all of the exhibits submitted into evidence at the administrative hearing, as well as the transcript of proceedings before the DOAH. We find petitioners' argument that the record is inadequate because the transcript of proceedings contains "inaudible" portions to be without merit because petitioners have not shown how they were prejudiced. See Booker v. Department of Employment Security, 216 Ill. App. 3d 320, 322 (1991) (finding that plaintiff was not denied due process based on "inaudible" portions in the transcript of the administrative hearing where plaintiff failed to demonstrate how he was prejudiced). Petitioners offer only the general assertion that the gaps in the transcript relate to "crucial" testimony, but point to no specific argument regarding the DOAH's liability findings that

15

they are precluded from raising based upon the "inaudible" portions of the transcript. In light of petitioners' failure to show prejudice, we decline to remand this matter to the DOAH to determine if a complete record can be obtained.

Petitioners also claim that the circuit court erred in affirming the decision of the DOAH because the inadequate record prevented the court from "perform[ing] its role of reviewing the evidence" presented at the administrative hearing. Petitioners rely on <u>Shallow v. Police Board of the City of Chicago</u>, 60 Ill. App. 3d 113 (1978), and <u>Neylon v. Illinois Racing Board</u>, 66 Ill. App. 3d 621 (1978), to support their argument. However, both of these cases are distinguishable.

In <u>Shallow</u>, the transcript of proceedings filed by the Board contained neither the recommendation of the hearing officer nor the findings or final decision of the Board. <u>Shallow</u>, 60 Ill. App. 3d at 115-16. Based upon that incomplete record, this court stated that it could not be judicially determined whether or not the Board made findings and conclusions on questions of fact, and thus remanded the case to the circuit court "to determine if a complete record [could] be obtained." <u>Shallow</u>, 60 Ill. App. 3d at 117. In <u>Neylon</u>, this court found that the record filed by the Civil Service Commission was insufficient to permit judicial review because it did not contain the exhibits that were submitted at the administrative hearing. <u>Neylon</u>, 66 Ill. App. 3d at 622-23.

Here, in contrast, the record filed by the City contains all of the evidence presented at the administrative hearing, as well as the findings and final decision of the DOAH. In light of the record submitted by the City, and petitioners' failure to point to any specific issue the circuit court was unable to review because of the allegedly "inadequate" transcript, we find that the court did not err by affirming the decision of the DOAH.

16

Petitioners next contend that the DOAH erred by holding that the fines imposed were the individual responsibility of Esposito rather than the corporate responsibility of Express Valet. Specifically, petitioners assert that the DOAH lacked the authority to hold Esposito personally liable for fines incurred during the operation of Express Valet, that Esposito, in his status as a corporate officer, cannot be held personally liable for Express Valet's obligations, and that there was insufficient evidence presented at the administrative hearing to "pierce the corporate veil" and hold Esposito personally liable for the fines imposed.

We initially note that, in making this argument, petitioners do not contest any of the DOAH's underlying findings of liability. Therefore, the only question before us is a legal one: whether the Code authorizes individual liability. This issue raises a question of statutory interpretation and, as such, our standard of review is *de novo*. See Richard's Tire Co. v. Zehnder, 295 Ill. App. 3d 48, 56 (1998).

Municipal ordinances are interpreted using the general rules of statutory interpretation and construction. Puss N Boots, Inc. v. Mayor's License Comm'n., 232 Ill. App. 3d 984, 986 (1992). The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature. In re Marriage of Rogers, 213 Ill. 2d 129, 136 (2004). The plain language of the statute is the best indicator of the legislature's intent, and when that language is clear, its meaning will be given effect without resort to other tools of interpretation. Metzger v. DaRosa, 209 Ill. 2d 30, 34 (2004).

In this case, the DOAH held that both Esposito and Express Valet were jointly and severally liable for the fines imposed in 9 of the 11 cases consolidated before the DOAH. In each

of those cases, Esposito and Express Valet were fined for violating section 4-232-060 of the Code.  Section 4-232-060 provides that "[n]o *person* shall conduct a valet parking service unless he has a valid valet parking operator license."  (Emphasis added.)  Chicago Municipal Code §4-232-060(a) (amended December 9, 1992).  In the ninth case, petitioners were found to have violated section 4-232-080(d) of the Code, which pertains to operating procedures.  The penalties for violating these sections are contained in section 4-232-100 of the Code, which  provides that "[a]ny *person* convicted of a violation of any provisions of Sections 4-232-060 or 4-232-080 shall be fined not less than $50.00 and not more than $500.00 for each offense."  (Emphasis added.)  Chicago Municipal Code §4-232-100 (amended December 9, 1992).  "Person," as used in Title 4 of the Code, is defined as "any *individual*, partnership, corporation or entity which conducts, engages in, maintains, operates, carries on or manages a business or occupation within the city of Chicago."  (Emphasis added.)  Chicago Municipal Code §4-4-010 (amended December 15, 1999).

In the ninth case, petitioners were also found to have violated section 4-276-470(a)(1) of the Code.  Section 4-276-480 of the Code provides that "[a]ny *person* violating *** Section 4-276-470 shall be fined not less than $50.00 nor more than $500.00 for each offense."  (Emphasis added.)  Chicago Municipal Code §4-276-480 (amended December 9, 1992).  "Person," as used in section 4-276-480, means "*any natural person* or his legal representative, partnership, corporation (domestic and foreign), company, trust, business entity or association, and any agent, employee, salesman, partner, officer, *** [or] stockholder."  (Emphasis added.)  Chicago Municipal Code §4-276-470(b)(3) (amended December 9, 1992).

18

In each of the nine cases where joint and several liability was imposed, petitioners were fined for violating section 2-24-050 of the Code. Section 2-24-050 provides that "[n]o *person* shall *** obstruct the commissioner of consumer services *** in the performance of his duties." (Emphasis added.) Chicago Municipal Code §2-24-050 (1990). In the ninth case, petitioners were also fined for violating section 2-24-060, which prohibits any "person" from engaging in any act of consumer fraud or deceptive practice while conducting a business in the city. See Chicago Municipal Code §2-24-060 (amended November 12, 1997). The penalties for violating these sections are found in section 2-24-080 of the Code, which provides:

> "Any *person* who *** (3) makes a deliberately false or
>
> deliberately misleading information to the commissioner; or (4)
>
> deliberately interferes with an investigation conducted by the
>
> commissioner *** shall be subject to a fine of not less than $100.00
>
> nor more than $500.00. *** Any *person* who otherwise violates
>
> Section 2-24-060 shall be subject to a fine of not less than $50.00
>
> nor more than $500.00." (Emphasis added.) Chicago Municipal
>
> Code §2-24-080 (amended April 6, 1990).

Although the Code does not define "person" as it is used in section 2-24-080, the Code consistently defines "person" in other sections to include, among other things, an individual or a corporation. See, e.g., Chicago Municipal Code §1-16-010(a) (amended March 12, 1986); Chicago Municipal Code §3-40-030 (amended December 15, 1993); Chicago Municipal Code §11-4-120 (amended July 19, 2000). Based upon the consistency in these definitions, we

conclude that "person," as used in section 2-24-080 of the Code, includes an individual.

As the foregoing makes clear, the Code imposes liability on any "person" who violates its provisions, and "person" is broadly defined to include individuals as well as entities such as corporations. Accordingly, we find that the Code authorizes the imposition of individual liability on corporate officers such as Esposito who violate the provisions at issue in this case. See Puss N Boots, Inc., 232 Ill. App. 3d at 987, quoting Benhart v. Rockford Park District, 218 Ill. App. 3d 554, 558 (1991) ("When a statute defines its own terms, 'those terms must be construed according to the definitions given to them' ").

Our interpretation of the Code, and the DOAH's imposition of personal liability on Esposito, is supported by principles of agency law. Although corporate officers are generally not liable for the corporation's torts (National Acceptance Co. of America v. Pintura Corp., 94 Ill. App. 3d 703, 706 (1981)), a corporate officer is individually liable for fraudulent acts of his own or those of the corporation in which he participates (Allabastro v. Cummins, 90 Ill. App. 3d 394, 398 (1980)); see also Citizen Savings & Loan Ass'n v. Fischer, 67 Ill. App. 2d 315, 323 (1966) ("The rule is that whoever participates in a fraudulent act is guilty of fraud"). A corporate officer is liable for the fraud of the corporation if he " 'with knowledge, or recklessly without it, participates or assists in the fraud.' " People ex rel. Hartigan v. E & E Hauling, Inc., 153 Ill. 2d 473, 502 (1992), quoting Murphy v. Walters, 87 Ill. App. 3d 415, 418-19 (1980).

Petitioners argue that the DOAH improperly "pierced the corporate veil" by imposing personal liability upon Esposito. However, piercing the corporate veil is necessary only when seeking to hold an officer liable for the *corporation's obligations*. See, e.g., Washington Courte

Condominium Ass'n-Four v. Washington-Golf Corp., 267 Ill. App. 3d 790, 816 (1994). In this case, however, the City charged Esposito individually with violating the Code. Each of the citations issued to petitioners clearly named both Frank Esposito and Express Valet as respondents. The record shows that Esposito was the owner and sole officer of Express Valet and, as such, Express Valet necessarily spoke only through him. Bettina Johnson of the Department testified that Esposito was the only person that she "dealt with" from Express Valet, and that Esposito submitted the insurance certificates indicating that Express Valet had the required insurance. Geoffrey Olsen, the agent who sold the insurance policy to Esposito, testified that those certificates were fraudulent and were not prepared by himself or anyone from his company. Olsen also testified that Esposito never made the down payment on the last insurance policy that Olsen sold to him, and that he informed Esposito by letter that the policy was cancelled as of Februrary 10, 2003, "for non-payment of premium." Esposito thereafter continued to operate Express Valet at various locations in the city and advertise that his company had the insurance coverage required by the Code. Additionally, Esposito was the person that patrons contacted to discuss problems with Express Valet. Tina Mednis testified that Esposito refused to give her Express Valet's insurance information so that she could file a claim for the damage to her family's car. Eric Fiche testified that he contacted Esposito regarding the parking ticket that he received while his car was in the custody of Express Valet, and that Esposito did not send him reimbursement for the ticket despite his promise to do so.

Moreover, petitioners do not dispute the DOAH's findings that Esposito failed to have insurance for Express Valet from February 10, 2003, through June 30, 2003, that Esposito knew

21

or should have known that Express Valet was uninsured, that the certificates of insurance were altered to obtain a valet parking license, that Esposito falsely represented to the public that Express Valet was insured from February 10, 2003, through June 30, 2003, that Esposito's conduct was deceptive to the public and interfered with the Department's duties to issue valet parking licenses, and that Esposito failed to appear at the hearing regarding the Mednis' compliant.

This record shows that Esposito personally instigated and actively participated in the fraudulent acts perpetuated upon the City and the general public. Based upon this record, we conclude that the DOAH did not err in holding that the fines imposed were the individual responsibility of Esposito as well as that of Express Valet. See Allabastro, 90 Ill. App. 3d at 398; People ex rel. Ryan v. Agpro, Inc., 345 Ill. App. 3d 1011, 1028-29 (2004) (finding corporate officer liable for violations of the Environmental Protection Act based upon his own conduct and active participation in those violations).

In reaching this conclusion, we reject petitioners' argument that JMH Properties, Inc. v. Industrial Comm'n, 332 Ill. App. 3d 831 (2002) is controlling and compels us to hold that the DOAH lacked authority to impose personal liability on Esposito. In JMH Properties, the claimant was electrocuted at work and thereafter filed claims with the Industrial Commission (Commission) against JMH Properties (JMH) and its principal stockholder. JMH Properties, 332 Ill. App. 3d at 832. An arbitrator denied the claim against the stockholder and found JMH solely liable for claimants injuries. JMH Properties, 332 Ill. App. 3d at 832. The claimant then filed a complaint in the circuit court, alleging that JMH had failed to pay the arbitrator's award. JMH

22

Properties, 332 Ill. App. 3d at 832. The complaint sought a judgment against JMH for the arbitrator's award, and sought to pierce JMH's corporate veil and enter judgment against the stockholder and his wife. JMH Properties, 332 Ill. App. 3d at 832. The trial court entered judgment against JMH and dismissed the count of the complaint seeking judgment against the stockholder, and the claimant thereafter filed a new complaint with the Commission, asking it to pierce JMH's corporate veil and enter judgment against the stockholder and his wife. JMH Properties, 332 Ill. App. 3d at 832. An arbitrator found the stockholder and his wife personally liable for the judgment against JMH, and that decision was affirmed by the Commission and the trial court. JMH Properties, 332 Ill. App. 3d at 832.

On appeal, this court initially observed that the Commission, as an administrative agency, had no common law powers and possessed only those granted to it by the legislature. JMH Properties, 332 Ill. App. 3d at 832-33. We noted that piercing the corporate veil was an equitable remedy, and that the Workers' Compensation Act (the Act) did not give the Commission the power to grant equitable relief or provide for individual liability against a corporation's officers, directors, or shareholders. JMH Properties, 332 Ill. App. 3d at 833. Accordingly, this court held that the Commission acted outside of its statutory authority when it pierced JMH's corporate veil and reversed the Commission's order imposing personal liability on JMH's shareholder. JMH Properties, 332 Ill. App. 3d at 833.

In this case, unlike in JMH Properties, the DOAH did not pierce Express Valet's corporate veil in order to hold Esposito personally liable for Express Valet's obligations. Rather, the DOAH held Esposito personally liable based upon his own conduct and participation in the

23

fraud perpetuated upon the Department and the public. Morever, unlike the Act at issue in <u>JMH Properties</u>, we have already concluded that the Code authorizes individual liability, and petitioners do not contest the DOAH's findings that Esposito's own conduct violated multiple sections of the Code. Accordingly, <u>JMH Properties</u> does not control our decision in this case.

Petitioners' final contention is that the fines imposed by the DOAH violate the excessive fines clause of the eight amendment to the United States Constitution (U.S. Const., amend. VIII), as well as the substantive due process requirements of the United States and Illinois Constitutions (U.S. Const., amend. XIV, §1; Ill. Const. 1970, art. I, §2). Petitioners do not assert that any of the penalty provisions of the Code, including the mandatory per-offense fines, are unconstitutional on their face, but only maintain that the aggregate amount of fines imposed, $135,825, is excessive when applied to the facts of this case and measured against that the alleged wrongdoing. Petitioners request that we remand this matter to the circuit court to enter a "judgment for the amount justified by the record." See 735 ILCS 5/3-111(a)(8) (West 2002).

When considering the validity of municipal ordinances, our analysis is guided by the same standards applicable to statutes. <u>City of Chicago v. Morales</u>, 177 Ill. 2d 440, 447 (1997). Municipal ordinances are presumed to be constitutional, and the party challenging the validity of an ordinance has the burden of showing that it violates the constitution. <u>O'Donnell v. City of Chicago</u>, 363 Ill. App. 3d 98, 105 (2005). Courts are obligated to uphold the constitutionality of an ordinance whenever reasonably possible. <u>City of Chicago v. Alton R.R. Co.</u>, 355 Ill. 65, 75 (1933). We review the constitutionality of an ordinance *de novo*. <u>O'Brien v. White</u>, 219 Ill. 2d 86, 98 (2006).

1-05-3998

Initially, we find that petitioners have waived their challenge to the constitutionality of the fines imposed by failing to comply with Supreme Court Rule 341(h)(7) (210 Ill. 2d R. 341(h)(7)). Supreme Court Rule 341(h)(7) requires appellants' brief to include " '[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on.' " Salgado v. Marquez, 356 Ill. App. 3d 1072, 1074 (2005), quoting 210 Ill. 2d R. 341(h)(7). " 'A reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. The appellate court is not a depository in which the appellant may dump the burden of argument and research.' " In re Marriage of Auriemma, 271 Ill. App. 3d 68, 72 (1995), quoting Thrall Manufacturing Co. v. Lindquist, 145 Ill. App. 3d 712, 719 (1986). An issue not clearly defined and sufficiently presented fails to satisfy the requirements of Supreme Court Rule 341(h)(7) and is, therefore, waived. Vincent v. Doebert, 183 Ill. App. 3d 1081, 1087 (1989).

In this case, petitioners have offered virtually no analysis as to why the fines imposed are excessive and unconstitutional. The record shows that petitioners committed 1,287 violations of the Code, yet petitioners have failed to address the propriety of any of the individual fines imposed on those violations or the conduct that each represents. Most significantly, petitioners have failed to address that they committed over 1,000 violations of the Code by operating without a valid valet parking license, that each day Express Valet operated in such a manner constituted a separate offense punishable by its own fine, and that the fines imposed for each violation are mandatory and provided by statute. Instead, petitioners have simply aggregated the fines imposed for those violations and claimed that this amount is "excessive." Moreover, petitioners have cited

25

no Illinois case law applying the excessive fines clause to statutory fines such as those in this case, and they do not even argue that the clause should be applied to the type of fines involved here. The cases petitioners do cite as authority for such an application involve civil forfeiture provisions that are different from the penalty provisions in this case. See Austin v. United States, 509 U.S. 602, 125 L. Ed. 2d 488, 113 S. Ct. 2801 (1993); United States v. Bajakajian, 524 U.S. 321, 141 L. Ed. 2d 314, 118 S. Ct 2028 (1998). In light of petitioners' failure to adequately present a challenge to the fines imposed, we conclude that this issue is waived. Vincent, 183 Ill. App. 3d at 1087.

Waiver aside, we find petitioners' contentions to be without merit. Petitioners first assert that the penalties imposed violate the excessive fines clause of the United States Constitution. Petitioners maintain that the total amount of fines imposed is excessive and represents an amount "vastly greater that what would be sufficient to simply compensate the City or the other individuals who testified at the original administrative hearing."

The eight amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." U.S. Const., amend. VIII. The excessive fines clause "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.' " (Emphasis omitted.) Austin, 509 U.S. at 609-10, 125 L. Ed. 2d at 497, 113 S. Ct. at 2805, quoting Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 265, 106 L. Ed. 2d 219, 232, 109 S. Ct. 2909, 2915 (1989). A fine is considered excessive "if it is grossly disproportional to the gravity of a defendant's offense." Bajakajian, 524 U.S. at 334, 141 L. Ed. 2d at 329, 118 S. Ct. at 2028.

The Code's licensing provisions pertaining to valet parking companies serve a legitimate interest of ensuring that patrons can safely and securely leave their vehicles with a valet parking service. Companies that interfere with or fail to obey the Code's licensing and insurance requirements undermine the public's expectation that a valet parking service is licensed and regulated by the City. The licensing provisions also ensure that those patrons receive a reasonable service from a valet parking company. The City also has a legitimate interest in securing compliance with the Code's provisions through penalties. See City & County of San Francisco v. Sainez, 77 Cal. App. 4th 1302, 1315, 92 Cal. Rptr. 2d 418, 429 (2000); see also Journal of the Proceedings of the City Council of Chicago, at 25469-10 ("[T]he implementation of a system of uniform, effective fines for violations of the license code provisions will promote compliance with the Code and will serve to effectuate the important public health and safety features of the Code"). Finally, the Code's provisions regarding consumer fraud are designed to prevent the perpetuation of fraud or deceptive practices upon the public.

Petitioners' violations of the Code clearly undermined the City's legitimate interest in licensing valet parking companies and warranted the fines that were imposed. The record shows that Esposito obtained an insurance policy for the relevant period through Geoffrey Olsen, and that Express Valet's insurance was cancelled because Esposito failed to make the required down payment for that policy. A letter was sent to Esposito informing him that the insurance policy was being cancelled, and he nevertheless continued to operate Express Valet without insurance and therefore without a valid valet parking license. Moreover, petitioners do not dispute the DOAH's finding that Esposito knew or should have known that his business was uninsured, that

27

fraudulent certificates of insurance were submitted to the Department in order to obtain a valet parking license, and that Esposito falsely represented to the public that Express Valet had the required insurance coverage.

Petitioners misleadingly aggregate the fines imposed and claim that this amount, $135,825, is excessive. Petitioners' argument ignores that almost all of that amount is based on a per-offense penalty, and that it was Esposito who controlled the extent of those fines. Specifically, approximately 95% of the total fines imposed, $126,900, were based on multiple violations of section 4-232-060(a) of the Code, which prohibits the unlicensed operation of a valet parking service. Pursuant to section 4-232-100 of the Code, each day that petitioners operated without a license constituted a separate offense, and each offense was punishable by a fine between $50 and $500. The DOAH found that petitioners operated without a license for 141 days at 9 separate locations, and therefore, petitioners were guilty of 1,269 separate and distinct offenses. Petitioners also ignore that they were fined only $100 per offense, which is near the minimum of the statutory range of fines that could have been imposed. The majority of the remainder of fines imposed, $5,000, is comprised of a $500 fine for each of the 10 violations of section 2-24-050 of the Code, which prohibits interference with the Department in the performance of its duties. Given the seriousness of the conduct that caused those violations - Esposito's submission of forged insurance certificates to obtain a license and failure to attend the hearing before the Department - we do not believe that it was excessive for the DOAH to impose the maximum penalty for each violation of section 2-24-050. Considering the amount of each fine imposed, Esposito's conduct in fraudulently submitting forged insurance certificates and knowingly

operating Express Valet without insurance or a valid license, and the City's legitimate interests that are served by the Code, we find that the fines imposed by the DOAH are not grossly disproportionate to the gravity of petitioners' offenses and therefore do not violate the excessive fines clause.

Petitioners also assert that the fines imposed by the DOAH violate the requirements of substantive due process. Petitioners claim that the fines were punitive rather than remedial, and that "punitive damages have traditionally been reserved for malicious and seriously reprehensible defendants." Petitioners maintain that the evidence establishing that Express Valet had a lack of prior history of violations, and the lack of evidence presented by the City showing individuals who suffered a financial loss due to petitioners' violations of the Code, demonstrates that the fines imposed were disproportional to the conduct being punished and the harm caused.

The due process clause prohibits the legislature from imposing a statutorily created penalty "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." St. Louis, Iron Mountain & Southern Ry. Co. v. Williams, 251 U.S. 63, 66-67, 64 L. Ed. 139, 141, 40 S. Ct. 71, 73 (1919). A statutory penalty will survive a due process challenge if it bears a rational relationship to a legitimate governmental interest. People v. Farmer, 165 Ill. 2d 194, 207-08 (1995).

Petitioners cite to BMW of North America, Inc. v. Gore, 517 U.S. 559, 134 L. Ed. 2d 809, 116 S. Ct. 1589 (1996) and State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 155 L. Ed. 2d 585, 123 S. Ct. 1513 (2003) in support of their argument that the fines imposed are punitive and violate due process. In State Farm Mutual Automobile Insurance Co.,

the Supreme Court observed that it had created specific guideposts for courts to utilize when reviewing punitive damages based on concerns that punitive damages " 'pose an acute danger of arbitrary deprivation of property' " and that juries are usually left with wide discretion in choosing amounts. State Farm Mutual Automobile Insurance Co., 538 U.S. at 418, 155 L. Ed. 2d at 601, 123 S. Ct. at 1520, quoting Honda Motor Co. v. Oberg, 512 U.S. 415, 432, 129 L. Ed. 2d 336, 349, 114 S. Ct. 2331, 2340 (1994).

The criteria set forth in BMW of North America are inapplicable to our analysis because the concerns over the imprecise nature of punitive damages are not present in this case. See In re Marriage of Chen v. Ulner, 354 Ill. App. 3d 1004, 1022 (2004) (declining to apply punitive damages criteria to claim that $100 per-day penalty for violation of Income Withholding for Support Act was grossly excessive and lacked sufficient due process protections). The penalties imposed on petitioners in this case were statutorily created and clearly provide notice of the range of fines that could be imposed for violations of the Code. Moreover, we have already concluded that the fines do not violate the excessive fines clause in light of the amount of each individual fine, the conduct that each fine represents, and the legitimate interests served by the Code's provisions. For these same reasons, we conclude that the fines imposed on petitioners bear a rational relationship to a legitimate governmental interest and are not so severe and oppressive as to be wholly disproportional to petitioners' offenses.

In their reply brief, petitioners direct our attention to the recent decision in In re Marriage of Miller, 369 Ill. App. 3d 46 (2006). Petitioners assert that Miller provides legal authority for this court to apply substantive due process requirements to the municipal ordinances at issue in

this case.

In <u>Miller</u>, Harold Miller was obligated to pay plaintiff $82 per week in child support pursuant to a dissolution of marriage. <u>Miller</u>, 369 Ill. App. 3d at 47. Defendant was subsequently served with an income withholding notice pursuant to section 35 of the Income Withholding for Support Act (Act) (750 ILCS 28/35 (West 2004)), which requires an employer to deduct child support payments from an employee's wages upon receipt of a income withholding notice and remit those payments to the State Disbursement Unit, and provides a penalty of $100 for each day that the amount designated in the income withholding notice is not remitted. <u>Miller</u>, 369 Ill. App. 3d at 47-48. Defendant subsequently failed to remit 128 child support payments, and the penalties for defendant's delay equaled $1,172,100. <u>Miller</u>, 369 Ill. App. 3d at 48. The circuit court entered a judgment against defendant for that amount, and defendant appealed, arguing that section 35 of the Act was unconstitutional as applied to the facts of that case and that the total penalty imposed deprived him of due process of law. <u>Miller</u>, 369 Ill. App. 3d at 48-50.

On appeal, this court noted that under the Non-Support Punishment Act, the legislature had authorized a maximum fine of $25,000 for the criminal offense of a spouse's willful failure to pay child support, and then observed that the $1,172,100 penalty imposed against the defendant was approximately 47 times greater than that amount. <u>Miller</u>, 369 Ill. App. 3d at 51. The second division of the First District of this court concluded that this "gross disparity" demonstrated that the penalty imposed was wholly disproportionate to the defendant's offense and obviously unreasonable, and therefore held that section 35 of the Act was unconstitutional as applied to the facts of that case. <u>Miller</u>, 369 Ill. App. 3d at 51.

While we agree that <u>Miller</u> involved the application of substantive due process to a statutory penalty, petitioners ignore that <u>Miller</u> involved an "as applied" challenge to a statute and therefore depended heavily upon the facts of that case. The facts in this case, however, are distinguishable from those in <u>Miller</u>. Most importantly, the penalty imposed in <u>Miller</u>, $1,172,100, is far greater than the aggregate amount of the fines imposed in this case, $135,825. Moreover, <u>Miller</u> involved a daily fine for a continuing violation of the Act, whereas in this case, petitioners committed 1,287 violations of six different provision of the Code. Approximately 95% of the fines imposed were based on petitioners' 1,269 violations of the section 4-232-060(a) of the Code by operating an unlicensed valet parking service. Unlike the penalty provision in <u>Miller</u>, the penalty provision for violating section 4-232-060(a) mandates that each day a valet parking service operates without a license constitutes a separate offense, and provides for a penalty between $50 and $500 per offense. See Chicago Municipal Code §4-232-100 (amended December 9, 1992). Finally, petitioners were fined $100 for each violation of section 4-232-060(a), which is near the minimum of the statutorily permissible range of penalties for that offense. Based on these factual differences, we conclude that <u>Miller</u> is distinguishable and does not compel us to hold that the fines imposed in this case are unconstitutional.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

CAHILL and R. GORDON, JJ., concur.