In the

# United States Court of Appeals

## For the Seventh Circuit

No. 21-1173

BRADLEY HOTEL CORP., doing business as
Quality Inn & Suites Bradley,

*Plaintiff-Appellant,*

*v.*

ASPEN SPECIALTY INSURANCE COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cv-04249 — **Charles P. Kocoras**, *Judge.*

ARGUED SEPTEMBER 10, 2021 — DECIDED DECEMBER 9, 2021

Before MANION, WOOD, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Like today's decision in *Crescent Plaza Hotel Owner, L.P. v. Zurich American Insurance Co.*, No. 21-1316 (7th Cir. Dec. 9, 2021), this case presents insurance coverage issues related to the partial closure of a hotel during the COVID-19 pandemic. While the parties are different, the result is the same. First, following our analysis in *Sandy Point Dental, P.C. v. Cincinnati Insurance Co.*, No. 21-1186 (7th Cir.

Dec. 9, 2021), we hold that the term "direct physical loss of or damage to" property does not apply to a business's loss of use of the property without any physical alteration. Second, we conclude that the loss of use exclusion and the ordinance or law exclusion in this policy provide separate bars to coverage.

I.   *Facts and Procedural History*

A.   *The COVID-19 Pandemic and Closure Orders*

In March 2020, Illinois took several steps to curtail the spread of COVID-19. On March 16, Governor Pritzker issued an executive order that suspended in-person dining immediately and, effective two days later, prohibited gatherings of fifty or more people. On March 20, another executive order required all nonessential businesses to cease operations. Hotels were classified as essential businesses for lodging and to provide delivery and take-out food services.

Plaintiff Bradley Hotel Corporation operates the Quality Inn & Suites in Bradley, Illinois. Along with guest rooms, the hotel includes a restaurant, bar, and general event space. After the Illinois closure orders were issued, Bradley suspended in-person dining at the restaurant and bar and cancelled previously scheduled weddings and meetings. Bradley alleges that it suffered losses of business income as a result of these cancellations.

B.   *The Insurance Policy*

Bradley purchased a general business property insurance policy from defendant Aspen Specialty Insurance Company that went into effect on May 1, 2019. Bradley alleges that its losses are covered under several coverage provisions, all of which require "direct physical loss of or damage to" covered property. The policy also includes two relevant exclusions.

First, the loss of use exclusion bars coverage for "loss or damage caused by or resulting from … [d]elay, loss of use or loss of market." Second, the ordinance or law exclusion bars coverage for "loss or damage caused directly or indirectly by … [t]he enforcement of or compliance with any ordinance or law: (1) Regulating the construction, use or repair of any property; or (2) Requiring the tearing down of any property."

C. *District Court Proceedings*

After Aspen denied Bradley's claim for losses under the insurance policy, Bradley sued Aspen in the Northern District of Illinois. Bradley sought damages for breach of contract and a declaratory judgment that its losses were covered by the policy. Aspen moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The district court granted the motion, holding that Bradley failed to allege that "the suspension of operations was a result of any physical loss of or damage to the property" or that "the physical property was changed or altered in any way." *Bradley Hotel Corp. v. Aspen Specialty Insurance Co.*, 508 F. Supp. 3d 249, 254 (N.D. Ill. 2020). We affirm.[1]

II. *Discussion*

A. *Legal Standard*

Our review of a district court's grant of a motion to dismiss for failure to state a claim is de novo. *Ochoa v. State Farm Life Insurance Co.*, 910 F.3d 992, 994 (7th Cir. 2018). We accept

---

[1] The district court also dismissed Bradley's claims under the policy's civil authority coverage, which applies where a covered cause of loss "causes damage to property other than property at the described premises" and "action of civil authority … prohibits access to the described premises." Bradley does not contest that decision on appeal.

the allegations in the complaint as true, and we draw all reasonable inferences in favor of the plaintiff. *Bilek v. Federal Insurance Co.*, 8 F.4th 581, 584 (7th Cir. 2021). Yet the complaint must still include "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard requires that the plaintiff show "more than a sheer possibility" of liability, but it "is not akin to a 'probability requirement.'" *Id.*, quoting *Twombly*, 550 U.S. at 556.

Bradley's claims arise under state law, and the parties agree that Illinois law applies. In Illinois, "An insurance policy is a contract, and the general rules governing the interpretation of other types of contracts also govern the interpretation of insurance policies." *Windridge of Naperville Condominium Ass'n v. Philadelphia Indemnity Insurance Co.*, 932 F.3d 1035, 1039 (7th Cir. 2019), quoting *Hobbs v. Hartford Insurance Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005). The court's function is "to ascertain and give effect to the intention of the parties, as expressed in the policy language." *Thounsavath v. State Farm Mutual Automobile Insurance Co.*, 104 N.E.3d 1239, 1244 (Ill. 2018). If the policy is unambiguous, its terms must be applied as written. *Id.* Ambiguity exists if the language of the policy is subject to more than one reasonable interpretation, as applied to the dispute before the court. *Founders Insurance Co. v. Munoz*, 930 N.E.2d 999, 1004 (Ill. 2010). But disagreement between the parties as to meaning does not itself make the policy ambiguous, and the court "will not strain to find an ambiguity where none exists." *Id.* Our inquiry focuses on

whether the terms are ambiguous as applied to the allegations before us. *Windridge*, 932 F.3d at 1039–40.

## B.  *Coverage*

The first issue presented is whether Bradley has alleged direct physical loss of or damage to its property. For the reasons explained in today's decision in *Sandy Point Dental*, No. 21-1186, slip op. at 7–14, we conclude that it has not.

## C.  *Exclusions*

The loss of use exclusion and the ordinance or law exclusion also provide independent grounds for denying coverage. Although the district court did not address the exclusions, we may affirm on any basis supported by the record, so long as the opposing party had a fair opportunity to be heard on the issue in the district court. *In re Airadigm Communications, Inc.*, 616 F.3d 642, 652 (7th Cir. 2010). Here, Bradley addressed the application of both exclusions in its brief opposing Aspen's motion to dismiss, and both parties briefed the issue fully on appeal.

### 1.  *The Role of Exclusions*

In an insurance coverage dispute, the burden is initially on the insured party to show that its losses are covered under the policy's coverage terms. *Addison Insurance Co. v. Fay*, 905 N.E.2d 747, 752 (Ill. 2009). Once that showing has been made, the burden shifts to the insurer to establish that an exclusion applies. *Id.* Exclusions are read narrowly and apply only if their application is "clear and free from doubt." *Scottsdale Insurance Co. v. Columbia Insurance Group, Inc.*, 972 F.3d 915, 919 (7th Cir. 2020), quoting *National Fire Insurance of Hartford v. Walsh Construction Co.*, 909 N.E.2d 285, 288 (Ill. App. 2009).

### 2. *The Loss of Use Exclusion*

The loss of use exclusion in the Aspen policy here bars coverage for "loss or damage caused by or resulting from … [d]elay, loss of use or loss of market." This language indicates that a mere loss of use cannot be the cause of a policyholder's losses. But that is exactly what Bradley seeks. Bradley alleges that it suffered business income losses and that the cause of those losses was an inability to use the hotel as it normally would. The hotel was not physically harmed or damaged in any way. Instead, Bradley was prohibited from using it for functions such as in-person dining, weddings, or large meetings. This loss of use fell squarely within the terms of the exclusion.

Bradley asserts that applying the loss of use exclusion here would render the policy's coverage for direct physical loss or damage superfluous. The argument misunderstands the exclusion. The problem is that Bradley alleges loss of use that is not tethered to any direct physical loss or damage that could serve as a covered cause of loss. By contrast, imagine that a tornado had damaged the hotel, leaving Bradley unable to use it until it was repaired. In that case, the loss of use would be the result of a covered cause of loss—the tornado causing direct physical damage to the property—so the exclusion would not bar coverage. In other words, the exclusion is triggered only when loss of use is the alleged *cause* of loss—not when it is the *result* of a covered cause of loss.

Bradley's causation arguments are also not persuasive. Bradley relies on *Mattis v. State Farm Fire & Casualty Co.*, 454 N.E.2d 1156 (Ill. App. 1983), which involved multiple contributing causes of loss. In that case, a home was damaged by some combination of poor design, which was covered, and

natural causes, which were not. The court recognized that if a policy insures loss caused by one risk but excludes loss caused by another risk, the loss caused by the insured risk is covered even if the excluded risk was also a contributory cause. *Id.* at 1161.

According to Bradley, the logic of *Mattis* should apply here. Bradley's theory is that there were two distinct causes of loss—the closure orders and the coronavirus—and that both contributed to the loss of use of the premises. That argument is unconvincing. First, it defies credulity to see the closure orders and the virus as two different causes of the claimed losses. As we explain today in a similar insurance case, the Illinois closure orders were indisputably caused by the coronavirus. See *Mashallah, Inc. v. West Bend Mutual Insurance Co.*, No. 21-1507, slip op. at 10 (7th Cir. Dec. 9, 2021) ("[T]he novel coronavirus causing the COVID-19 pandemic led directly to the issuance of the government orders….").

Even if these were two different causes, moreover, Bradley still would not be able to establish that either one is a *covered* cause. The *Mattis* rule is relevant where the insured can show that the policy "expressly insures against loss caused by one risk." 454 N.E.2d at 1161, quoting *Kraemer Bros., Inc. v. U.S. Fire Insurance Co.*, 278 N.W.2d 857, 863–64 (Wis. 1979). Bradley cannot meet that burden here because, as explained in *Sandy Point Dental*, a mere loss of use of property, without any physical alteration, is not "direct physical loss or damage" and therefore does not qualify as a covered cause of loss. See *Sandy Point Dental*, No. 21-1186, slip op. at 7–14.

### 3. *The Ordinance or Law Exclusion*

The ordinance or law exclusion in the Aspen policy also bars coverage here. It excludes "loss or damage caused directly or indirectly by … enforcement of or compliance with any ordinance or law … [r]egulating the construction, use or repair of any property." Bradley acknowledges that the Illinois closure orders regulated the "use" of property. Bradley argues, however, that none of the governor's executive orders for business closures qualifies as an "ordinance or law" within the meaning of the exclusion. We conclude that they do.[2]

The policy does not define the terms, so we interpret them as an average reader would. *Gillen v. State Farm Mutual Automobile Insurance Co.*, 830 N.E.2d 575, 582 (Ill. 2005). The word "law" can have a broad meaning. E.g., *Law*, Black's Law Dictionary (11th ed. 2019) ("The aggregate of legislation, judicial precedents, and accepted legal principles; the body of authoritative grounds of judicial and administrative action; esp., the body of rules, standards, and principles that the courts of a particular jurisdiction apply in deciding controversies

---

[2] At oral argument, Bradley asserted for the first time that it had "purchased back" applicable coverage otherwise barred by the ordinance or law exclusion. The endorsement Bradley cites provides coverage where an "ordinance or law … [r]egulates the demolition, construction or repair of buildings, or establishes zoning or land use requirements at the described premises." But this coverage applies only if the building sustains "direct physical damage." Since Bradley has not alleged that the hotel suffered such damage, there is no coverage under the purchased back ordinance or law endorsement. In addition, because Bradley has abandoned its claim for civil authority coverage, we do not address whether or when the ordinance or law exclusion would independently bar coverage under that provision.

brought before them."); *Law*, Webster's Third New International Dictionary (unabr. ed. 1993) ("a binding custom or practice of a community"); *Law*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/law (last visited Dec. 9, 2021) ("a rule of conduct or action prescribed … or formally recognized as binding or enforced by a controlling authority").

What actions qualify as "law" is one of those profound questions at the root of the rule of law and the legal profession. For example, jurists, scholars, and practitioners of public international law have long debated when international agreements and standards, backed up by credible prospects of coercive consequences in case of a violation, are legally binding, and just what sorts of consequences are sufficient to render an agreed norm something we call international "law." For a concise survey of some of those debates, see, for example, Anthony D'Amato, *Is International Law Really "Law"?*, 79 Nw. U. L. Rev. 1293 (1984–1985).

For our domestic purposes in this case, however, the question about what counts as a law is not as difficult and esoteric. We need not and could not decide here whether all governors' executive orders qualify as laws. They come in many varieties and with different prospects for enforcement or means of compliance, particularly when they are addressed to state employees in the executive branch. See, e.g., Miriam Seifter, *Gubernatorial Administration*, 131 Harv. L. Rev. 483, 499–515 (2017) (discussing a variety of tools governors have at their disposal to direct state agency action); Benjamin S. Longlet, Comment, *Gubernatorial Executive Orders in Wisconsin: The Case for Judicial Enforcement*, 2000 Wis. L. Rev. 1323 (surveying uses of executive orders in one state).

The executive orders here had the force of law and could be enforced with coercive sanctions against private businesses and persons. That is because the legislature authorized the governor to take such emergency measures to protect public health and to impose such consequences for violations. When Governor Pritzker issued the closure orders, he was acting under statutory authority that enabled him to regulate "the use, sale or distribution of … materials, goods, or services; and perform and exercise any other functions, powers, and duties as may be necessary to promote and secure the safety and protection of the civilian population." 20 Ill. Comp. Stat. Ann. 3305/7(12). These executive orders thus had binding, coercive power on private individuals and businesses. See, e.g., Ill. Exec. Order No. 2020-10 ¶ 17 (Mar. 20, 2020) ("This Executive Order may be enforced by State and local law enforcement pursuant to, inter alia, Section 7, Section 18, and Section 19 of the Illinois Emergency Management Agency Act, 20 ILCS 3305."). These executive orders fell well within what we understand to be laws, just as rules and adjudications by executive agencies acting under legislative grants of authority have binding force of law.

Bradley responds that such an expansive definition of "law" would necessarily encompass "ordinance[s]" and therefore render that term superfluous. To give the words distinct meanings, Bradley asserts that "law" should be understood much more narrowly, to mean only a statute passed by a federal or state legislature, while "ordinance" refers to a municipal statute or regulation.[3]

---

[3] Bradley initially defines "ordinance" as "a municipal statute" but then seems to expand that definition to include all "municipal regulations." We are not persuaded that the policy would limit "law" to statutes

This argument fails for several reasons. First, as discussed in *Crescent Plaza*, some overlap in insurance policies is common and does not violate the rule against superfluity. *Crescent Plaza*, No. 21-1316, slip op. at 10–11 (noting frequent use of "belt-and-suspenders" approach in drafting insurance policies); see also *Great West Casualty Co. v. Robbins*, 833 F.3d 711, 717 (7th Cir. 2016) ("Some redundancy in insurance contracts is normal…."). The belt-and-suspenders approach is sensible in this setting, and we will not fault insurers for using terms with broad meanings.

As we also emphasize in *Crescent Plaza*, context is key when interpreting an insurance policy. *Crescent Plaza*, No. 21-1316, slip op. at 8–9. In some contexts, the word "law" might refer only to a statute passed by a legislature. E.g., *Law*, Black's Law Dictionary (11th ed. 2019) (including "A statute" as another possible definition). But we doubt that an ordinary reader would understand the term to have so narrow a meaning here. The Sixth Circuit recently expressed skepticism toward such a strained interpretation in a similar insurance dispute. See *Santo's Italian Café LLC v. Acuity Insurance Co.*, 15 F.4th 398, 406 (6th Cir. 2021). Although the court rested its holding on other grounds, it suggested that "the ordinance or law dichotomy seems more likely to capture the difference between local government regulations on one side of the ledger and statewide and nationwide regulations on the other." *Id.* Without suggesting that "ordinance" is limited to exercises of local governmental power with the force of law, we conclude that, in this policy, the words "law" and "ordinance" together

---

passed by a state or national legislature, while at the same time defining "ordinance" to mean both statutes and executive regulations at the municipal level.

encompass any regulation with binding, coercive force at the local, state, or national level. (We leave international questions for another day.)

By contrast, Bradley's interpretation of the exclusion would lead to strange results. If "law" meant only a statute passed by a federal or state legislature, then a regulation issued by the federal Occupational Safety and Health Administration to establish construction or maintenance requirements for buildings would not be included. Nor would a state or local fire marshal's order imposing an occupancy limit on a hotel's space for public events. Those results would be improbable. The exclusion applies to "any ordinance or law" that regulates "the construction [or] use … of any property." Or suppose a governor issued an executive order requiring demolition of a building. That too would not be covered by Bradley's interpretation, even though the exclusion specifically refers to "any ordinance or law" that requires "the tearing down of any property." We decline to read this seemingly random limitation into the exclusion simply because it uses broad language.

The judgment of the district court is AFFIRMED.