2022 IL App (1st) 211147-U

THIRD DIVISION
June 15, 2022

No. 1-21-1147

_____

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| ARK RESTAURANTS CORPORATION, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellant, | ) | of Cook County |
| | ) | |
| v. | ) | 2020-CH-001240 |
| | ) | |
| ZURICH AMERICAN INSURANCE COMPANY, | ) | Honorable |
| | ) | Raymond W. Mitchell, |
| Defendant-Appellee | ) | Judge Presiding |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Gordon and Justice Burke concurred in the judgment.

O R D E R

¶ 1    *Held*: Insured did not suffer "direct physical loss of or damage to property" within the meaning of its commercial property insurance policy when the insured suspended or scaled back restaurant operations in early 2020 as required by government-imposed restrictions intended to curb COVID-19 pandemic.

¶ 2    Ark Restaurants Corporation (Ark Restaurants) brought claims of declaratory judgment, breach of contract, and bad faith against its commercial property insurer, Zurich American Insurance Company (Zurich). The complaint was based on Zurich's denial of business income and extra expense claims that Ark Restaurants made after suspending or curtailing its restaurant, bar, and catering operations in compliance with state orders during the COVID-19 pandemic. This appeal is from a circuit court order granting Zurich's motion to dismiss. The court ruled that Ark Restaurants alleged the mere loss of use rather than the "direct physical loss of or damage to

property" that would trigger coverage. Ark Restaurants argues that the policy does not require structural or tangible change to property and that an insured "physical loss" occurred when the government restrictions "physically impaired the access, occupancy or use of property." As an alternative, Ark Restaurants asks for a remand because leave to amend its complaint is "indisputably required under Illinois law in response to a motion to dismiss."

¶ 3 The complaint indicates that Ark Restaurants is a New York corporation that leases, owns, or operates several dozen restaurants, bars, and catering facilities in Alabama, Connecticut, District of Colombia, Florida, Nevada, New Jersey, and New York. These states issued executive orders in March and April 2020 (the early days of the pandemic) that were intended to control the outbreak of COVID-19 by requiring the temporary closure of businesses whose services were nonessential. As early as March 20, 2020, Ark Restaurants was "forced to suspend, limit or otherwise modify business operations for all of its properties." As a result of the government orders, the insured premises "could no longer be physically accessed, used or operated as intended." Ark Restaurants purchased the policy after there were public reports of a "mysterious form of pneumonia." The coverage subsequently took effect on February 17, 2020. Zurich is a New York corporation whose primary place of business is in Schaumburg, Illinois.[1] Counts I through III of the complaint were about "business interruption" and extra expense coverage. Ark Restaurants sought declaratory judgment of coverage, compensatory damages for breach of contract, and compensatory and punitive damages for bad faith in claims handling. In

---

[1] The policy was issued in New York, however, Illinois law was applied in the circuit court and will be applied here because (1) Illinois courts apply the law of the forum by default, and (2) it is undisputed that the relevant laws of the two states do not conflict and that "a choice-of-law determination is required only when the moving party has established an actual conflict between state laws" which would make a difference in the outcome. *Bridgeview Health Care Center, Ltd. v. State Farm Fire & Casualty Co.*, 2014 IL 116389, ¶ 25.

the next three counts, which were about "contingent business interruption" and extra expense coverage, Ark Restaurants set out claims for declaratory judgment, breach of contract, and bad faith. Counts VII through IX were about ingress/egress coverage. And the final three counts, Counts X through XII, were about civil authority coverage.

¶ 4    The various forms of coverage at issue include the phrase "direct physical loss of or damage." For instance, in section 7.11 of the commercial property policy, a "Covered Cause of Loss" is defined as "[a]ll risks of *direct physical loss of or damage* from any cause unless excluded." (Emphasis added.)

¶ 5    The "Time Element" (business interruption and extra expense) coverage provision in section 4.01.01 of the contract states:

"The Company will pay for the actual Time Element loss the Insured sustains, as provided in the Time Element Coverages, during the Period of Liability. The Time Element loss must result from the necessary Suspension of the Insured's business activities at an Insured Location. The Suspension must be due to *direct physical loss of or damage* to Property (of the type insurable under this Policy other than Finished Stock) caused by a Covered Cause of Loss at the Location[.]" (Emphasis added.)

¶ 6    The "Extra Expense" coverage clause in section 4.02.03 states:

"The Company will pay for the reasonable and necessary Extra Expenses incurred by the Insured, during the Period of Liability, to resume and continue as nearly as practicable the Insured's normal business activities that otherwise would be necessarily suspended, due to *direct physical loss of or damage* caused by a Covered Cause of Loss to Property of the type insurable under this policy at a Location." (Emphasis added.)

¶ 7   Also, according to section 4.03.01 of the policy, if coverage is implicated, it extends to the losses sustained during the "Period of Liability," and section 4.03.01.01 of the policy defines the "Period of Liability" for the insured's "building and equipment" as:

"The period starting from the time of *physical loss or damage of the type insured against* and ending when with due diligence and dispatch the building and equipment could be repaired or replaced, and made ready for operations under the same or equivalent physical and operating conditions that existed prior to the damage. The expiration of this Policy will not limit the Period of Liability." (Emphasis added.)

¶ 8   Section 5.02.03's "Civil or Military Authority" coverage applies to Time Element (business interruption) losses that are attributable to property loss or damage that occurs not at the insured property, but at property within a five-mile radius of the insured property that affects the insured's access:

"The Company will pay for the actual Time Element loss sustained by the Insured, as provided by this Policy, resulting from the necessary Suspension of the Insured's business activities at an Insured Location if the Suspension is caused by order of civil or military authority that prohibits access to the Location. That order must result from a civil authority's response to *direct physical loss of or damage* caused by a Covered Cause of Loss to property not owned, occupied, leased or rented by the Insured or insured under this Policy and located within the distance of the Insured's Location as stated in the Declarations."

¶ 9   Two exclusions are relevant here. Section 3.03.02.01 of the policy excludes coverage for any "[l]oss or damage arising from delay, loss of market, or *loss of use*." (Emphasis added.) The

coverage exclusion for "Contamination" that is set out in sections 3.03.01 and 3.03.01 precludes coverage for loss or damage caused by and "any cost due to" "Contamination," including the "inability to use or occupy property or any cost of making property safe or suitable for use or occupancy. "Contamination" is defined in section 7.09 as "[a]ny condition of property due to the actual presence of any *** pathogen or pathogenic organism, bacteria, *virus*, disease causing or illness causing agent[.]" (Emphasis added.)

¶ 10    Ark Restaurants is appealing from an order granting Zurich's motion to dismiss pursuant to section 2-615 of the Code of Civil Procedure. 735 ILCS 5/2-615 (West 2020). The appellant contends that the circuit court erroneously relied on *Traveler's Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 301 (2001), to determine the meaning of the word "physical" as it appears in the repeated contract phrase "direct physical loss of or damage to property." Neither nor the word nor the phrase are defined in the policy. In *Eljer*, 192 Ill. 2d at 301-02, the Illinois supreme court held that the term "physical injury" connotes "damage to tangible property causing an alteration in appearance, shape, color or in other material dimension" and does not include intangible damage to property, such as economic loss. Applying *Eljer* and reading "physical" to modify both "loss" and "damage" in the Zurich policy phrase, the circuit court remarked that Ark Restaurants had not alleged that its property "was in any way altered in appearance, shape, color or in other material dimension." Rather, the "only loss alleged is solely the loss of use of its business premises," and "the policy cannot be interpreted to cover mere loss of use that is intangible and economic in nature."

¶ 11    A motion to dismiss pursuant to section 2-615 attacks the legal sufficiency of a complaint based on defects apparent on its face. *Lee v. State Farm Fire & Casualty Co.*, 2022 IL App (1st)

210105, ¶ 14. In an appeal from a section 2-615 dismissal, the question posed is whether, taking all the well-pled facts as true, and construing the allegations in the complaint in a light most favorable to the plaintiff, the plaintiff stated a cause of action upon which relief may be granted. *Jane Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 2012 IL 112479, ¶ 16. Our review is *de novo*. *Eljer*, 197 Ill. 2d at 292 (the construction of the provisions of an insurance policy is a question of law, subject to *de novo* review).

¶ 12    An insurance policy is a contract and the general rules that govern the interpretation of contracts also govern the interpretation of insurance policies. *Sproull v. State Farm Fire & Casualty Co.*, 2021 IL 126446, ¶ 19. The courts' primary objective is to ascertain and give effect to the intention of the parties, as expressed in the policy's language. *Sproull*, 2021 IL 126446, ¶ 19. "The construction should be a natural and reasonable one." *Sproull*, 2021 IL 126446, ¶ 19.

> [There is] a general rule that an integrated contract, unless it is ambiguous or controlled by some rule of law establishing a definite meaning, is to be given the meaning which would be attached to the contract by a reasonably intelligent person acquainted with all the operative usages and knowing all of the circumstances existing prior to and at the time of the contract, other than oral statements by the parties of what they intended it to mean." 2 Couch on Insurance § 22:38 (Steven Plitt *et al* eds., 3d ed. Dec. 2021 update).

¶ 13    Accordingly, unambiguous, undefined terms will be given their "plain, ordinary, and popular meaning; *i.e.*, they will be construed with reference to the average, ordinary, normal, reasonable person." *Sproull*, 2021 IL 126446, ¶ 19; *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 108 (1992) (if the words in a policy are clear and unambiguous,

courts read them with their plain, ordinary and popular meaning). "A policy term is not ambiguous because the term is not defined within the policy or because the parties can suggest creative possibilities for its meaning." *State Farm Mutual Automobile Insurance Co. v. Elmore*, 2020 IL 125441, ¶ 21. "[P]rovisions should be applied as written, and the parties should be bound to the agreement [that] they made." *Elmore*, 2020 IL 125441, ¶ 21.

¶ 14    Oftentimes, courts will consult a dictionary to determine the commonly understood meaning of a word. See *e.g.*, *Outboard Marine*, 154 Ill. 2d at 115 (consulting Webster's Dictionary); *Eljer*, 197 Ill. 2d at 301 (consulting general language and legal dictionaries). In this instance, however, the commonly understood meaning of the word "physical" in the context of property coverage was previously litigated in *Eljer*, in which the Illinois supreme court consulted both Webster's Dictionary and Black's Law Dictionary before coming to the conclusions which we quoted above. *Eljer*, 197 Ill. 2d at 301-02. The suit was about whether a certain type of residential plumbing system that was manufactured between 1979 and 1990 and might have a high failure rate caused "property damage" at the moment of installation or when it first actually leaked. *Eljer*, 197 Ill. 2d at 291. One group of *Eljer* comprehensive general liability (CGL) policies defined covered "property damage" as "injury to or destruction of tangible property" and another group of *Eljer* CGL policies defined covered "property damage" as "*physical* injury to *** tangible property." (Emphasis added.) *Eljer*, 197 Ill. 2d at 294, 298. In other words, the first group of policies did not include the word "physical" and the second group of policies did include the word. The supreme court found that the first phrase may include diminution in home value due to the mere installation of the unreliable plumbing system. *Eljer*, 197 Ill. 2d at 294-95. To interpret the second type of policy, the supreme court went to general language and legal

dictionaries to look up the plain, ordinary and popular meaning of the word "physical." *Eljer*, 197 Ill. 2d at 301. The court found that inclusion of the word "physical" in the second phrase meant covered injury did not occur until there was an "alter[ation] in appearance, shape, color or other material dimension" of the property. *Eljer*, 197 Ill. 2d at 301. The supreme court also noted that "to the average mind, tangible property does not experience 'physical' injury if that property suffers intangible damage, such as diminution in value[.]" *Eljer*, 197 Ill. 2d at 301-302.

¶ 15    Ark Restaurant argues that *Eljer* is not controlling because all of the *Eljer* policies included the word "tangible," and the Zurich policy does not include that word. This argument, however, only draws attention to the fact that the supreme court was addressing the meaning of the word "physical," not some other word. As the circuit court recognized, *Eljer*'s focus on the meaning of the word "physical" makes *Eljer* the definitive statement in Illinois insurance law on the meaning of the Zurich policy phrase "direct *physical* loss of or damage to property." (Emphasis added.)

¶ 16    Ark Restaurants also argues *Eljer* is distinguishable because the word "physical" in the *Eljer* policies modified the word "injury," not the words "loss" or "damage" like in the Zurich policy. The Illinois Supreme Court did not address the precise policy language before us, but we disagree with Ark Restaurants because *Eljer*'s analysis was about the meaning of the very word "physical," not the words that this adjective modified. We also point out that in a recent case, *Lee*, the same argument was rejected by a panel of this appellate court that was addressing another insurance company's coverage for "physical loss to property." *Lee*, 2022 IL App (1st) 210105, ¶ 19 ("Evanston Grill argues that [*Eljer*] is not directly on point because the relevant policy language there implicated an interpretation of 'physical injury' and not 'physical loss,' but

we find any such distinction irrelevant."). It is our opinion that the circuit court correctly adhered to *Eljer* in construing the meaning of "physical" as a modifier of "loss" and "damage" in the Zurich policy and concluding that Ark Restaurants' loss of its intended use of property was not "physical" loss or damage to property.

¶ 17    Furthermore, the circuit court is not the only court to rely on *Eljer* in this context. *Eljer*'s definition has been employed in other COVID-19 loss cases including *ABW Development, LLC v. Continental Casualty Co.*, 2022 IL App (1st) 210930, ¶ 30 ("We find no reason to depart from the definition [of 'physical'] used by our supreme court in *Eljer*, and accordingly we conclude that the policy [held by the plaintiff medical imaging clinics in Illinois and Indiana] *** unambiguously requires that the covered loss or damage be physical in nature, meaning that property has been 'alter[ed] in appearance, shape, color or in other material dimension.' "). *Eljer* was also referenced in *Sweet Berry Café, Inc. v. Society Insurance, Inc.*, 2022 IL App (2d) 210088, ¶ 40 (*Eljer*'s "interpretation of the term 'physical injury to tangible property,' is consistent with the dictionary definition of 'physical' upon which we rely" to reject appeal of South Elgin restaurant regarding business income and extra expense coverage).

¶ 18    In addition, federal courts applying Illinois law have cited *Eljer* in litigation brought by other commercial property policyholders that were suffering financial losses due to the COVID-19 pandemic. In *Sandy Point Dental*, the United States Court of Appeals for the Seventh Circuit concluded that under *Eljer*, " 'direct physical loss' *** requires a physical alteration to property." *Sandy Point Sandy Point Dental, P.C. v. Cincinnati Insurance Co.*, 20 F. 4th 327, 333 (7th Cir. 2021). The plaintiff, a private dental group that suspended 95% of its business in compliance with the State's orders, argued, as Ark Restaurants argues, that "loss" means

something different from "damage." The Seventh Circuit had "no quarrel with the idea." *Sandy Point Dental*, 20 F. 4th at 332. But the court reasoned that the "proposed distinction is neither the only possible reading nor a likely one." *Sandy Point Dental*, 20 F. 4th at 332. "The words 'direct physical' are most sensibly read as modifying both 'loss' and 'damage' " because "[a]ny other interpretation would commit the same sin against which the [insureds] caution us–namely making surplusage out of the word 'physical.' Whatever 'loss' means, it must be physical in nature." *Sandy Point Dental*, 20 F.4th at 332. Applying this reasoning, the Seventh Circuit concluded that the dental group did not and could not allege that the shutdown orders physically altered their property because it "needed to allege more than a partial loss of [the] preferred use of the insured premises." *Sandy Point Dental*, 20 F. 4th at 336-37. See *State Bank of Cherry v. CGB Enterprises, Inc.*, 2013 IL 113836, ¶ 51 (federal district and circuit cases, particularly cases from the Seventh Circuit, are persuasive authority in Illinois state court).

¶ 19    Similarly, in *Image Dental*, the District Court for the Northern District of Illinois, applying Illinois law, discussed why "[l]oss and loss of use do not mean the same thing:"

"By way of illustration, the loss of a car does not mean the same thing as the loss of *use* of a car. Ask any grounded teenager.

Sometimes a loss of use can come from a physical loss. For example, an insured could suffer a loss of use of a car if it is totaled in a car accident, or if someone steals it. But there are times when a loss of use could come from something else, too. For example, a driver could drop his keys in Lake Michigan. That's a loss of the keys, but only a loss of use of the car. Under the policy in question, a *physical* loss is a *sine qua non* [(indispensable requirement)] of coverage. A loss of use without a physical loss

doesn't count." *Image Dental*, 543 F. Supp. 3d at 590-91.

¶ 20 Stated another way, "[t]he nature of the loss must be *physical*, not intangible, immaterial, economic, or regulatory." *Image Dental*, 543 F. Supp. 3d at 590. See 10A Couch on Insurance § 148:46 (Steven Plitt et al eds., 3d ed. Dec. 2021 update) ("The requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim *** when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property."). Accordingly, the district court explained, when courts have interpreted the same or substantially similar policy language, "Courts in this district [and across the nation] have concluded that comparable property damage policies do not cover purely economic losses caused by the shutdown during the pandemic. *** [T]here is no loss of use without physical loss." *Image Dental*, 543 F. Supp. 3d at 591 (collecting cases).

¶ 21 In fact, there has been a spate of similar, unsuccessful claims in the federal appellate circuits regarding economic losses during the pandemic. *E.g.*, *10012 Holdings, Inc. v. Sentinel Insurance Co., Ltd.*, 21 F. 4th 216, 221 (2d Cir. 2021) (stating that since the start of the COVID-19 pandemic, New York courts applying New York law have denied coverage "where the insured property itself was not alleged or shown to have suffered direct physical loss or physical damage"); *Uncork & Create LLC v. Cincinnati Insurance Co.*, 27 F. 4th 926 (4th Cir. 2022) (West Virginia art studios' inability to operate as intended due to closure order and COVID-19 pandemic did not qualify as "physical loss" or "physical damage" to covered property as required for business income loss coverage); *Terry Black's Barbecue, L.L.C. v. State Automobile Mutual Insurance Co.*, 22 F.4th 450, 456 (5th Cir. 2022) ("Considering the plain meaning of

'physical loss,' we conclude [the Texas barbeque restaurants'] claim is not covered by the [business income and extra expense] provision. \*\*\* Nothing physical or tangible happened to [the] restaurants at all. In fact, [the claimant] had ownership of, access to, and ability to use all physical parts of its restaurants at all times. And importantly, the prohibition on dine-in services did nothing to physically deprive [it] of any property at its restaurants."); *Estes v. Cincinnati Insurance Co.*, 23 F. 4th 695 (6th Cir. 2022) (Kentucky dental offices' losses as a result of shutdown orders and COVID-19 pandemic did not qualify as "direct physical loss" within meaning of business income and extra expense coverage of commercial property insurance policy); *Oral Surgeons, P.C. v. Cincinnati Insurance Co.*, 2 F. 4th 1141, 1144 (8th Cir. 2021) (policy held by Iowa oral surgery clinic "clearly requires direct 'physical loss' or 'physical damage' to trigger business interruption and extra expense coverage. Accordingly, there must be some physicality to the loss or damage of property—*e.g.*, a physical alteration, physical contamination, or physical destruction."); *Mudpie, Inc. v. Travelers Casualty Insurance Co. of America*, 15 F. 4th 885 (9th Cir. 2021) (California children's store did not suffer "direct physical loss of or damage to property," from shelter-in-place orders as required for insured to recover loss of business income or extra expense, under comprehensive commercial property policy); *Goodwill Industries of Central Oklahoma, Inc. v. Philadelphia Indemnity Insurance Co.*, 21 F.4th 704, 711 (10th Cir. 2021) (Oklahoma non-profit retailer's "temporary inability to use its property for its intended purpose was not a 'direct physical loss.' To conclude otherwise would ignore the word 'physical' and violate the requirement that every part of a policy be given meaning"); *Gilreath Family & Cosmetic Dentistry, Inc. v. Cincinnati Insurance Co.*, 21-11046, 2021 WL 3870697, at \*2 (11th Cir. Aug. 31, 2021) (Georgia dental practice "alleged nothing

that could qualify, to a layman or anyone else, as physical loss or damage. Here, the shelter-in-place order that [it] cites did not damage or change the property in a way that required its repair or precluded its future use for dental procedures. In fact, though the practice postponed routine and elective procedures, [the plaintiff] still used the office to perform emergency procedures.")

¶ 22    Furthermore, consideration of other sections of the policy confirms that coverage for "direct physical loss of or damage to property" does not include temporary restrictions on Ark Restaurants' commercial use of its space. We look to those other sections because courts construe insurance contracts "as a whole, giving effect to every provision, if possible, because *** every provision was intended to serve a purpose." *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.*, 223 Ill. 2d 352, 362 (2006); *Eljer*, 197 Ill. 2d at 292 (same). In addition, "insurance policies often use overlapping provisions to provide greater certainty on the scope of coverages and exclusions." *Crescent Plaza Hotel Owner, L.P. v. Zurich America Insurance Co.*, 20 F.4th 303, 311 (7th Cir. 2021); *Certain Interested Underwriters at Lloyd's, London v. Stolberg*, 680 F.3d 61, 68 (1st Cir. 2012) ("insurance policies are notorious for their simultaneous use of both belts and suspenders, and some overlap is to be expected").

¶ 23    Section 4.03.01.01 defines the "Period of Liability," during which an insured may recover in the event of direct physical loss of or damage to property, as:

> "The period starting from the time of physical loss or damage of the type insured against and ending when with due diligence and dispatch the building and equipment *could be repaired or replaced*, and made ready for operations under the same or equivalent physical and operating conditions that existed prior to the damage." (Emphasis added.)

¶ 24    That Ark Restaurants is insured until its property can be "repaired or replaced" harmonizes with the meaning of "physical damage" and "physical loss." When property is physically damaged, it must be repaired; when property is physically lost, it must be replaced. "Without a physical alteration to property, there would be nothing to repair, rebuild, or replace." *Sandy Point*, 20 F. 4th at 333. Ark Restaurants' insurance claim cannot be reconciled with the definition of "Period of Liability" because the claim does not come within the policy.

¶ 25    We have also considered the fact that section 3.03.02.01 contains an exclusion for "Loss or damage arising from delay, loss of market, or *loss of use*." (Emphasis added.) In *Bradley Hotel*, the Seventh Circuit addressed a business property insurance dispute stemming from the partial closure of a hotel in Bradley, Illinois during the COVID-19 pandemic. *Bradley Hotel Corp. v. Aspen Specialty Insurance Co.*, 19 F. 4th 1002, 1005 (7th Cir. 2021). The insured property, which had guest rooms, a restaurant, bar, and general event space, hoped to recoup the financial losses it experienced after it stopped all in-person dining and cancelled weddings and meetings in compliance with state orders that suspended in-person dining and prohibited gatherings of 50 or more people. *Bradley Hotel.*, 19 F. 4th at 1005. Applying Illinois law, the Seventh Circuit affirmed that this exclusion bars coverage for losses caused by use limitations that were implemented in compliance with COVID-19 government orders: "The hotel was not physically harmed or damaged in any way. Instead, [the insured] was prohibited from using it for functions such as in-person dining, weddings, or large meetings. This loss of use fell squarely within the terms of the exclusion [for loss or damage caused by or resulting from *** loss of use]." *Bradley Hotel*, 19 F. 4th at 1007.

¶ 26 The coverage provisions and the exclusion language all indicate that Ark Restaurants' claims for coverage fail.

¶ 27 Ark Restaurants, nevertheless, cites *In re Society Insurance Co. COVID-19 Business Interruption Protection Insurance Litigation*, 521 F. Supp. 3d 729, 741 (N.D. Ill. 2021), for the proposition that "physical loss of" might cover something different from "physical damage." Ark Restaurants then argues that the dictionary definitions of "physical," and "loss" do not necessarily require structural alteration. It also argues that the phrase "physical loss of" can include "impaired *** access, occupancy or use of property." This argument is unpersuasive in part because the district court's decision was issued before the Seventh Circuit effectively overruled that decision in *Sandy Point Dental*, by concluding, "Without any physical alteration to accompany it, this partial loss of use does not amount to a 'direct physical loss.' " *Sandy Point Dental*, 20 F. 4th at 334. We reiterate that the Seventh Circuit determined that the dental group did not and could not allege that the shutdown orders physically altered its property because it "needed to allege more than a partial loss of [the] preferred use of the insured premises." *Sandy Point Dental*, 20 F. 4th at 336-37. Thus, the concepts that Ark Restaurants cites from *In re Society*, 521 F. Supp. 3d 729, are no longer good law. This argument is unpersuasive for the additional reason that Ark Restaurants cobbles together various dictionary definitions that are quite different from the definition employed in *Eljer*, and, without saying as much, Ark Restaurants is asking us to overrule *Eljer*. Ark Restaurants relies on *In re Society*, 521 F. Supp. 3d 729, for the additional idea that government orders being lifted is a "repair" of the insured property. But the Seventh Circuit rejected that reasoning as well in *Sandy Point Dental*, 20 F. 4th at 333, when it ruled, "Without a physical alteration to property, there would be nothing to

repair, rebuild, or replace."

¶ 28    Ark Restaurants next contends that "before the spread of the COVID-19 pandemic, five states' highest courts and seven other states' intermediate appellate courts held that the phrase 'physical loss' and its variants include property that is rendered unusable even without tangible or structural changes." We would expect Ark Restaurants to discuss and analogize the facts of these cases with its own predicament, but instead it tucks these case citations into footnotes with very brief parenthetical descriptions about the issues addressed. An appellant is required by the rules regarding appellate briefs to provide reasoned argument and citation to relevant authority. Ill. S.Ct. R. 341(h)(7) (eff. Oct. 1, 2020). A reviewing court is entitled to have issues "clearly defined with pertinent authority cited and a cohesive legal argument presented" and the appellant may not foist the burden of argument and research onto the court. (Internal quotations omitted.) *Express Valet, Inc. v. City of Chicago*, 373 Ill. App. 3d 838, 855 ( 2007). An issue that is not clearly defined and sufficiently presented fails to satisfy the requirements of Rule 341(h)(7) and is waived. *Express Valet*, 373 Ill. App. 3d at 855. The presentation here borders on waiver. In any event, even in the appellant's own words, none of those earlier cases concerned the COVID-19 virus. As examples, Ark Restaurants contends that *Western Fire Insurance Co. v. First Presbyterian Church*, 437 P.2d 52, 53 (Colo. 1968) is a pre-pandemic case about "gasoline fumes;" *Sentinel Management Co. v. Aetna Casualty & Surety Co.*, 615 N.W.2d 819 (Minn. 2000), is a pre-pandemic case about "asbestos [fibers];" *Mellin v. Northern Security Insurance Co*, 167 N.H. 544, 115 A.3d 799 (2015), is a pre-pandemic case about "urine odor;" and *Dundee Mutual Insurance Co. v. Marifjeren*, 1998 ND 222, 587 N.W.2d 191 (1998) is a pre-pandemic case about a "power outage." Suffice to say, the cursory presentation does not compel us to

disregard (1) an Illinois Supreme Court decision which determined the meaning of a key word in the Zurich coverage at issue and (2) a whole array of federal cases which addressed the same or substantially the same policy language and its application to businesses substantially similar to Ark Restaurants that struggled under the same COVID-19 restrictions. The same sentiment holds true for the Illinois cases that Ark Restaurants cites as the "majority rule"—albeit not any majority rule with respect to COVID-19 era losses. See *Elco Industries, Inc. v. Liberty Mutual Insurance Co.*, 414 N.E.2d 41, 45 (1980) (regarding coverage for damages allegedly incurred when defect in governor regulating pins was not discovered until after installation into buyer's engines); *Pittway Corp. v. American Motorist Insurance Co.*, 370 N.E.2d 1271, 1274 (1977) (regarding coverage for damages claimed after defective valve assemblies were incorporated into aerosol cans). Ark Restaurants comes to the conclusion, "As these decisions illustrate, the [circuit court's] interpretation not only expanded *Eljer* far beyond its limits to something approaching a bright-line rule, but also substituted a skewed and inaccurate selection of national decisions for well[-]settled Illinois precedent." Ark Restaurants' skeletal presentation has not led us to the same conclusion.

¶ 29     Even if Ark Restaurants had persuaded us to disagree with *Eljer* and the on-point federal authority discussed above, Ark Restaurants still would not prevail on appeal. Its claims fail for the independent reason that they are not the result of a "Covered Cause of Loss." Section 7.11 of the policy defines "Covered Cause of Loss" as "[a]ll risks of direct physical loss of or damage to property from any cause *unless excluded*." (Emphasis added.) The policy's Contamination Exclusion in sections 3.03.01 and 3.03.01.01 excludes "Contamination, and any cost due to Contamination *including the inability to use or occupy property or any cost of making property*

*safe or suitable for use or occupancy*[.]" (Emphasis added.) Section 7.09 defines "Contamination" as "Any condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, *virus*, disease causing or illness causing agent[.]" Thus, the Contamination Exclusion excludes coverage for claims caused by any condition of property due to the actual presence of a virus or disease or illness-causing agent, including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy. The policy removes a virus, the COVID-19 virus, as a potential "Covered Cause of Loss."

¶ 30    Ark Restaurants alleged in paragraphs 20 and 22 of its complaint that COVID-19 is caused by the SARS-CoV-2 virus and has been present in every state in the country. In paragraphs 33-41 and 46, Ark Restaurants further alleges that COVID-19 caused various government entities to issue orders requiring the suspension of business at Ark's properties. Then, as a result of these orders, Ark argues that it "suffer[ed] suspension, limitation, and alteration of its normal business operations" which is compensable under the policy. In short, Ark seeks coverage for restrictions on its use of property caused by the COVID-19 virus, and these restrictions fall squarely within the unambiguous Contamination Exclusion.

¶ 31    Ark Restaurants argues that the government orders, not the COVID-19 virus, are what caused its claimed losses. However, courts have consistently recognized that the COVID-19 virus is what precipitated the government orders and the type of business losses at issue. *E.g.*, *Mashallah, Inc. v. West Bend Mutual Insurance Co.*, 20 F. 4th 311, 321 (7th Cir. 2021) ("The complaint's attempt to decouple the government COVID-19 orders from the COVID-19 virus itself are untenable" and "there can be no honest dispute that the coronavirus was *the* reason

these orders were promulgated."); *Franklin EWC, Inc. v. Hartford Financial Services Group, Inc.*, 488 F. Supp. 3d 904, 908 (N.D. Cal. 2020) ("[U]nder Plaintiffs' theory, the loss is created by the Closure Orders rather than the virus, and therefore the Virus Exclusion does not apply. Nonsense.").

¶ 32    Ark Restaurants argues that it is entitled to "Civil Authority" coverage because there was "physical contamination of neighboring properties with the COVID-19 virus thus prompting the issuance of the government shutdown orders." "Civil Authority" coverage, which was pled in three counts of the complaint, is unavailable because, as discussed above, (1) the presence of COVID-19 virus on property, whether that property was Ark Restaurants' property or neighboring property, does not cause "direct physical loss of or damage to property," and (2) even if COVID-19 did cause loss or damage, it would not be covered loss or damage because of the Contamination Exclusion.

¶ 33    The 12-count complaint included six counts about the policy's "Contingent Time Element" and "Ingress/Egress" coverages. These claims fail for the same two reasons that "Civil Authority" coverage fails.

¶ 34    Furthermore, Ark Restaurants does not address "Contingent Time Element" coverage in its opening appellate brief, and it barely mentioned "Ingress/Egress" coverage, but it did not include any argument about it. More specifically, Ark Restaurants mentions Ingress/Egress coverage twice in its brief. In the first sentence of the argument section of its brief (on pages 8 and 9), Ark Restaurants states: "Taken as true, the facts of the Complaint demonstrate that Ark has suffered direct physical loss of covered property at its premises resulting in the suspension of business operations and covered losses, including lost Business Income and Extra Expense and

ingress/egress coverage." The next instance is listed in a subheading (on page 26): "II. THE CHANCERY COURT LIKEWISE ERRED IN FINDING THAT ARK DID NOT STATE A PLAUSIBLE CLAIM FOR CIVIL AUTHORITY AND INGRESS/EGRESS COVERAGE." Despite the subheading, the ensuing argument is about Civil Authority coverage only. Ingress/Egress coverage differs from Time Element, Extra Expense, and Civil Authority coverages addressed above, in part because Ingress/Egress coverage is applicable when access to an insured location is prevented by a "physical obstruction." Ark Restaurants' failure to include argument about Contingent Time Element and Ingress/Egress coverage means it has forfeited the appeal of these claims. *Express Valet*, 373 Ill. App. 3d at 855.

¶ 35 All of Ark Restaurants' bad faith claims fail because these types of claims fail when there is no coverage or there is a "*bona fide* dispute" over coverage. *Illinois Founders Insurance Co. v. Williams*, 2015 IL App (1st) 122481, ¶ 32 (indicating that when a *bona fide* dispute concerning coverage exists, costs and sanctions pursuant to section 155 of the Illinois Insurance Code, 215 ILCS 5/155 (West 2020) are "inappropriate"). A *bona fide* dispute is one that is " '[r]eal, actual, genuine, and not feigned.' " *Illinois Founders*, 2015 IL App (1st) 122481, ¶ 32 (quoting *McGee v. State Farm Fire & Casualty Co.,* 315 Ill. App. 3d 673, 683 (2000) (quoting Black's Law Dictionary 177 (6th ed. 1990)). For the two reasons stated above regarding coverage, there is no coverage available, and, in any event, there has been a *bona fide* dispute over coverage.

¶ 36 Finally, Ark Restaurants wants an opportunity to cure its factual allegations and faults the circuit court for not even considering amendment. We review the ruling for an abuse of discretion. *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273-74 (1992). It is never an abuse of discretion to deny leave to when the proposed amendment would be futile.

*Butler v. BRG Sports, LLC*, 2019 IL App (1st) 180362, ¶ 71. The argument, however, reveals that amendment would be futile. Ark Restaurants contends that it would allege that it "was forced to make physical changes, modifications, revisions and refurbishments of its insured premises in order to comply with the government shutdown orders." It adds that these modifications "are exactly the type of alteration in 'appearance, shape, color, or in other material dimension' required under the Chancery Court's narrow interpretation [of the law]." In other words, Ark Restaurants is contending that voluntarily making "physical" modifications to its premises in response to government orders is "direct physical loss of or damage to" covered property. This is not a sound argument. See *Crescent Plaza Hotel*, 20 F.4th at 307 (Dallas hotel owner did not allege direct physical loss or damage to its property when it indicated it was required to incur expenses to install plexiglass partitions and hand sanitizer stations, to display signs throughout the hotel, and to move furniture to permit social distancing); *Cafe La Trova LLC v. Aspen Specialty Ins. Co.*, 519 F. Supp. 3d 1167, 1182 (S.D. Fla. 2021) (for an insured to argue that "moving furniture and installing partitions is sufficient to trigger coverage for its business income losses" is "nonsensical" and circular because it would mean that activity was both the cause and repair of damage). Because the claims Ark Restaurants proposes to raise via amendment would have been futile, the circuit court did not abuse its discretion in denying leave to amend.

¶ 37    Summarizing, coverage would be triggered by "direct physical loss of or damage to" Ark Restaurants' restaurants, bars, or catering facility properties, but shutdown orders issued because of COVID-19 did not physically alter the appearance, shape, color, structure, or other material dimension of the covered property. Consequently, Ark Restaurants did not plead an insured loss,

nor did it show that amending its pleading would have changed the outcome. The circuit court's dismissal order with prejudice is affirmed.

¶ 38    Affirmed.